Exhibit (A)



*Affadavit of John P. Morgan, M.D.*

I, JOHN P. MORGAN, hereby declare that:

1. I am Medical Professor and Director of the Pharmacology Program at the City University of New York Medical School. Additionally, I am an Associate Professor of Internal Medicine and Pharmacology at the Mt. Sinai School of Medicine in New York City. I am licensed to practice medicine in the state of New York. My curriculum vitae is attached hereto as Exhibit A.*

2. I am board certified in Internal Medicine and am certified by the American Medical Society on Alcoholism and Other Drug Dependencies. I have spent most of my clinical and academic career working in the areas of clinical pharmacology and toxicology and am particularly interested in the clinical pharmacology of alcohol and drugs of abuse. My recent monography on the clinical pharmacology of alcohol and abused drugs has been published by The Federal Government through The National Council on Alcohol Information and has been distributed to all Pharmacology Departments in the United States and Canada. This particular test was also distributed to all applicants who applied to The American Medical Society on Alcoholism and Other Drug Dependencies to take the first national certifying exam in October of 1986. It was used in review courses offered in preparation for that examination.

3. In addition to this text I have published numerous articles on alcohol and abused drugs. My education and experience is set forth in more detail in the attached curriculum vitae.

4. I have testified as an expert witness and filed affidavits on the issues of drug use, drug prescribing and drug testing before many different courts and administrative bodies. I have served as expert witness or have filed documents in such cases as: *Jones vs. McKenzie* 628 F. Supp. 1500 (D.D.C. 1986); *Storms vs. Coughlin* 600 F. Supp. 1214 (S.D.N.Y. 1984); *NTEU vs. Von Raab* No. 86-3522 (E.D.La. 1986); *Evans vs. Casey* No. 86-1217 (E.D. Pa. 1986).

I shall begin this declaration with some general statements and shall then specifically refer to other statements filed in this matter.

* Editor's note: Because of space limitations, this attachment has been deleted.

*SAMPLE COLLECTION*

5. Urine testing problems begin with sample collection. A person undergoing testing may have acquired the various techniques of substituting someone else's (presumably clean) urine. Additionally, depending upon the screening tests used (see below), a urine sample may be treated with a variety of contaminants which will disrupt the required chemical methodology. All of these issues of switching and doctoring urine simply means that adequate "witnessing" includes observation of the urinary stream from the urethral opening to the container. The passage of urine for testing must be accompanied by humiliating observation - there is no other way. These words must not be mistaken as support for such actions. I believe this process is repugnant when applied to innocent people and cannot be condoned.

6. Collected urine is ordinarily subjected then to screening tests. Documents filed in this matter spend much time discussing the appropriateness and utility of screening tests. Such tests are generally cheap and easily applied to large numbers of specimens by laboratory workers. The two screening tests to be used by LSI merit careful consideration.

*THIN LAYER CHROMATOGRAPHY (TLC)*

7. The LSI documents and those filed by supporting experts spend a surprising number of words on the venerable technique of TLC. It is surprising that this generally insensitive non-specific and subjective technique is being so highly touted. It is well described in the declaration filed by Dr. Willette. A urine specimen is spotted on a glass plate coated with solid absorbent. The plate is placed in a container holding a solvent that migrates up the plate carrying the constituents of the urine various distances from the origin. The constituents are identified by spraying the dried plate with chemicals to produce visible spots. The color of the spots and the distance traveled are then inspected and compared to standards for tentative identification. The problems with the technique are enormous. The distance traveled and the color developed vary not only with drug but with each and every specimen. The colors are robin's egg the next. Interfering substances including food stuffs and drugs may plate out. Heroin addicts subjected to TLC testing in the past have learned that a herbal preparation called Golden Seal contained plant alkaloids that would spot out on TLC plates near opioids and confuse the test. LSI directives state that a photograph is to be made of each positive plate. I have never seen an adequate photograph of a TLC plate pre-

sented in a courtroom or hearing. In fact the utility of TLC in any forensic matter is open to question because laboratories cannot present adequate representations of the evidence but fall back on the "experience" of their technicians. To quote Dr. Willette:

> "Because of the subtle variabilities sometimes seen in the distance traveled and color of the spots in TLC, it requires considerable training and experience in order to achieve a high degree of reliability in interpreting TLC results."

I fully agree and also feel that some regularly employed technicians never reach this state. The subjective nature of the testing ensure confusing readings and false positives and false negatives.

8. My statements are firmly backed by evidence. Recently, a study by the Center for Disease Control (CDC) has achieved much attention. In this study a group of laboratories were performing urinary surveillance for methadone clients testing for a variety of abused drugs. The CDC sent these laboratories specimens through the client clinics so that the laboratories were unaware of the quality control study. These laboratories failed miserably. The number of laboratories with acceptable perfor-mance was extremely low. With other drugs (morphine, barbiturates, amphetamine, cocaine) *ninety percent* of the labs fell below acceptable criteria. False negatives predominated but false positives occurred as well. The technique used by these laboratories was essentially always *thin layer chromatography.* One logically enough hears from laboratories and their directors such as Ms. Pizzo that their labs will not be subject to this kind of error, yet all of the labs in the CDC survey would have said the same.

9. The CDC no longer carries out the independent survey of quality control described above. Ms. Pizzo describes a large number of quality control programs consisting of internal and external samples. However, all of the programs cited are voluntary and, more importantly, none of the programs provide "blind" samples. Although LSI may not know if the samples received are positive or negative, they do know that the samples are part of a quality control program. It is a standard practice in laboratories that the QC samples receive special attention not necessarily given to the routine samples, which in today's urine testing marketplace run into the thousands per day.

10. Moreover, the drugs screened by LSI listed in its "basic screen" appears to be keyed to screening by TLC and not to the particular concerns of Pacific. As I have said, TLC is non-specific and will detect a large number of compounds, as reflected in LSI's list. This list includes many compounds such as phenylpropanolamine,

quinine, salicylates (Aspirin), and acetaminopen (Tylenol), which are legally obtainable over-the-counter or by prescription and which are not psychoactive or impairing. It also excludes potentially impairing compounds.

11. I earlier stated my surprise at the resurrection of TLC. I recently heard Dr. Willette at a Washington D.C. meeting run by The Bureau of National Affairs explain away the sad CDC results by referring to the TLC as outdated in the face of newer methods such as the immunoassays. However, I believe that this resurrection and defense of TLC is to a degree warranted because of the ongoing poor record of the second test in discussion, the enzyme immunoassay referred to by one branded version, EMIT.

12. The testing program described by LSI and applied to the workers at Pacific is defended because of the application of the EMIT test as a second screening test. LSI deserves some credit for not carrying out a practice used in some laboratories in which an EMIT test is used as a confirmation of TLC. However, the EMIT test is inherently flawed and performs poorly in a variety of settings. Most of the non-military clients previously advised by Drs. Willette, Sedgewick and Mr. Bensinger and his associate Dr. Dupont still use the EMIT test as the first screen. I am hard pressed to find a reason to use it in any forensic setting. My reasons follow.

13. The methodology of the enzyme immunoassay is again well described in a number of documents. The test relies upon the production of an antibody to a drug metabolite produced by injecting the metabolite into an animal and later harvesting the antibody drom the animal's blood. Such antibodies bind to the metabolite in a biological specimen. The detection of this binding is accomplished in the EMIT test because the binding also inactivates an enzyme chemically attached to the metabolite. If the enzyme is not inactivated by such binding, it will act upon a suitable substrate (also added to the specimen) and cause a change in the light transmission of the specimen provoked by the product of the enzyme-substrate reaction. If all goes well, this complex series of events will detect the presence of the drug metabolite. The EMIT test is available for a variety of drug metabolites including opioids, benzodiazepines, amphetamine-like drugs, cannabinoids, etc. The test is quite sensitive and indeed is aggressively promoted because it will identify drug metabolites that occur in low concentrations and *which are often missed by TLC* because of that low concentration; including cannabinoid metabolite, benzodiazepine metabolite and cocaine metabolite.

14. The most serious problem of EMIT is the non-specificity of

the antibody. The opioid test relies upon an antibody to a morphine metabolite and the reactivity may indicate the presence of a number of drugs including heroine, morphine, codeine or the over-the-counter cough supressant dextromethorphan or even the small amount of opioid excreted in the urine from ingesting poppy seeds. The amphetamine test reacts more readily with some non-amphetamine products than amphetamine. It will specifically react with two medications, ephedrine and phenylpropanolamine which are found in literally hundreds of over-the-counter cough-cold, anti-allergy and anorexiant products. The benzodiazepine metabolite test will react with the metabolite of flurazepam (Dalmane) the most widely prescribed hypnotic in the United States. These problems of cross-reactivity are enormous and in my opinion seriously compromise the utility of the EMIT test in any forensic setting. The "answer" to this problem, according to LSI, is to further intrude into the privacy of those tested by demanding that they list medications that they take. This intrudes into matters usually shared by people only with their physicians. More importantly, the question is not directed to impaired workers but like the essence of this program intrudes into the lives of innocent people.

15. The discussion of EMIT non-specificity is important but fades when the issue of EMIT testing for cannabinoid is considered. In most urine testing programs it is the only commonly identified illegal drug. Billings for expensive GC/MS confirmatory work from LSI will most often list the search for marijuana metabolite.

*EMIT CANNABINOID TEST*

16. Although the EMIT methodology was developed in the early 1970's its application to the detection of marijuana metabolite was not commercially available until 1980. The antibody is prepared to an inactive marijuana metabolite which is 11-nortetrahydrocannabinol-9-carboxilyc acid (THC-acid). This antibody is not particularly specific either. It reacts with a variety of cannabinoids and the cannabinoid supplied by Syva to use in calibration for the EMIT d.a.u. version is a different cannabinoid which has similar immunoreactivity. Because cannabinoids seldom appear in human urine except secondary to exposure to marijuana it has been touted as relatively specific. Depending upon choice of versions, the EMIT test is very sensitive and will respond to relatively low concentrations of the metabolite. Although the LSI documents are not en-

© Clark Boardman Callaghan 5/96 (DTM) 

tirely clear, they are willing to report a positive of 20 ng/ml as a result of acceptance of the lowest possible reading of the EMIT dau.

There are five specific problem areas of the EMIT cannabinoid test I wish to address.

A. The test measures only inactive metabolite, which may be excreted for a lengthy period of time after sue. As Drs. Willette and Sedgewick note, the presence of a positive cannabinoid test in the urine is not a measure of intoxication. The compound excreted in the urine has no psychoactivity. Further, humans vary in their generation of metabolite and their urine volume and metabolite concentration so widely that it is unlikely that any urine test can *ever* be used as a key to marijuana effect. Humans can excrete the metabolite after last use for a period of days to weeks to months. In a paper by Ellis, et al.[1] one subject required 67 days to yield a negative EMIT dau for 10 consecutive days. Occasional smokers may yield a positive result for a week or more using the EMIT dau.[2]

B. The EMIT test will react positively in individuals passively exposed to marijuana smoke. This is of course a factor of cutoff. After early arguments, a recent paper by Dr. Cone and his associates illuminated this issue.[3] Using the EMIT dau they arrived at these conclusions:

After one or more passive exposures to the smoke of 16 marijuana cigarettes, the percent of urine samples positive for cannabinoids was nearly equivalent to that after active smoking of one marijuana cigarette. Exposure to the smoke of four marijuana cigarettes produced positive EMIT 20 assay results for cannabinoids in urine from four of five subjects.

In recent months, consultants and laboratories have apparently shifted to recommendation of the less sensitive EMIT St which has a cutoff point of 100ng/ml. This has been done, I believe, in response to Dr. Cone's article. However, Ms. Pizzo and LSI continue to use

---

[Section 5:40]

1 Ellis, G.M., Mann, M.A., Judson, B.A., Schramm, N.T. and Tashchian, A., Excretion Patterns of Cannabinoid Metabolites After Last Use in a Group of Chronic Users, 38 Clin Pharmacol Therap 572–78 (1985).

2 Bastiani R.J., Urinary Cannabinoid Excretion Patterns, in The Cannabinoids: Chemical, Pharmacologic, and Therapeutic Aspects 263–80 (ed. Agurell Dewey & Willette 1984).

3 Cone, E.J. & Johnson, R.E. Contact Highs and Urinary Cannabinoid Excretion After Passive Exposure to Marijuana Smoke, Clin Pharmacol Therap 40 247–56 (1986).

the more sensitive test despite the problems it will cause due to possible passive exposure.

C. The EMIT test has an unacceptably high rate of false positive tests. Ms. Pizzo chooses to discuss a publication in which a high percentage of EMIT positives were confirmed by GC/MS. This particular paper[4] listed two of her consultants (Foltz and Willette) amongst the authors. This paper did indeed report high rates of GC/MS confirmation. However there are a number of papers (including some published in the same journal) which depicted a much gloomier picture. These publications and the non-confirmation rate of EMIT cannabinoid testing follow.

| | | *false positive percentage* |
|---|---|---|
| 1981 | O'Connor and Rejent[5] | 15% |
| 1982 | M.A. Peat, et al.[6] | 11%; 38% (2 studies) |
| 1982 | Whiting and Manders[7] | 33% |
| 1984 | N.J. Dept of Corrections in Morgan[8] | 25% |
| 1984 | A.B. Jones, et al.[9] | 34% |

[4] Irving, J., Leeb B., Foltz, R.L., Cook, C.E., Bursey, J.T. & Willette, R.E. Evaluation of Immunoassays for Cannabinoids in Urine, 8 J Analytical Toxicology 192–96 (1984).

[5] O'Connor, J.E. & Rejent, T.A., EMIT Cannabinoid Assay: Confirmation by RIA & GC/MS, 5 J Anal Toxicol 168–73 (1981).

[6] Peat M.A., Finkle B.S. & Deyman M.E., Laboratory Evaluation of Immunoassay Kits for the Detection of Cannabinoids in Biological Fluids, in The Analysis of Cannabinoids in Biological Fluids, ed. R.L. Hawks, NIDA Monograph No. 42, at 85-98 (1982).

[7] Whiting, J.D. & Manders, W.W., "Confirmation of a Tetrahydrocannabinol Metabolite in Urine by Gas Chromatography, 6 J Anal Toxicol 49–52 (1982).

[8] Morgan, J.P., Problems of Mass Urine Screening for Misused Drugs, 16 J Psycho Drugs 305–17 (1984).

[9] Jones, A.B., ElSohly, M.A. & Arafat, E.S., Analysis of the Major Metabolite of Delta-9-Tetrahydrocannabinol in Urine IV: A Comparison of Five Methods, 8 J Anal Toxicol 249–51 (1984).

| | | |
|---|---|---|
| 1984 | Black, et al.[10] | 28% |
| 1985 | Frederick, et al.[11] | 7% |

The citing of one study and Syva promotional material does not outweigh this record.

Further, my paper, reference (8), attracted the attention (negative) of The Syva Corporation because it was cited in an adverse decision regarding a Syva submission to sell more tests to the Department of Defense. The decision of the Comptroller General of the United States and the criticism of the inaccuracy rate of the EMIT cannabinoid test is revealing. It is appended as Exhibit B.

D. The EMIT cannabinoid test may respond inappropriately to a number of drug products not yet identified.

During 1986, The Syva Corporation mailed 4 letters to clients explaining that some EMIT tests yielded false positives because of the presence in the urine of commonly prescribed anti-arthritic drugs such as ibuprofen, fenoxoprofen and naproxen. The letters assured us that changing the detector enzyme to G-6-PD solved the problem. However, there is no documentation of that claim. There is a strong possibility that the high degree of protein binding of the anti-arthritic drugs may have impaired the antibody from binding to the drug metabolite-enzyme complex. The enzyme would therefore not be inactivated as would ordinarily occur in a "clean" urine. This phenomenon may explain in part the generally poor performance of the EMIT cannabinoid test in the past. It also means that other drug substances consumed by humans which are highly protein bound such as penicillin or phenytoin or clofibrate may affect the test. The EMIT cannabinoid test was widely and increasingly sold for six years before this problem emerged.

E. The EMIT test is very sensitive to adulteration and contamination. A paper by Schwartz[12] documents that the test is foiled by the addition of table salt, liquid hand soap, household bleach or a drop or two of blood.

---

10 Black, D.L., Goldberger, B.A., Isenschmid, D.S., White, S.M. & Caplan, H., Urine Cannabinoid Analysis: An Integrated Multi-Method Approach, 8 J Anal Toxicol 224–27 (1984).

11 Frederick, D.L., Green, J. & Fowler, M.W., Comparison of Six Cannabinoid Metabolite Assays, 9 J Analytical Toxicology 116–20 (1985).

12 Schwartz, R.H., Hayden, G.F. & Riddile M., Laboratory Detection of Marijuana Use, 139 Am J Dis Child 1093–96 (1985).

*GAS CHROMATOGRAPHY/MASS SPECTROMETRY*

17. It is true that GC/MS testing represents the best method for identifying drug metabolites in biological fluids. I do not accept however that it is virtually without error. The machinery is sensitive and requires careful maintenance. False positives may occur because of carry over when a negative specimen follows one that is strongly positive. The method may exceed 95% or even 97% in accuracy but it is not without error.

These are other issues that merit warning. The GC/MS method focuses on a single cannabinoid metabolite, the THC carboxylic acid previously discussed. The EMIT test responds to all reactive cannabinoids. The GC/MS reading will yield a lower number which may be 10-50% of the EMIT dau number. So if the EMIT number at 20ng/ml is accepted, where shall the line be drawn for the GC/MS? Will LSI report 1 or 2 9ng/ml as a confirmation? Some labs will not. Some labs accept the inherent limitation of machines and do not report a positive below 20ng/ml or 10ng/ml. It is important to recall that these numbers represent 20 or 10 billionths of one gram.

*THE YESAVAGE, ET AL. STUDY*

18. This study using flight simulators has been widely discussed and previously used as a strategic justification for urine testing. Most studies indicate that the effects of marijuana are relatively rapidly dissipated and usually are not detectable 2–3 hours after smoking. Some have speculated that more subtle effects could be detected with finer measurements. A few studies have indicated some potential impairment of complex skills, such as automobile operation for longer times, up to 8 or 10 hours. There are very few such publications and they are, I think, tentative. However the paper by Yesavage identifies significant impairment 24 hours after smoking marijuana in a group of volunteer pilots who performed on a flight simulator. These conclusions are striking and have not yet been replicated or confirmed. After careful analysis of the publication I have concluded that the experimental methodology was so flawed that the study does not prove impairment at 24 hours.

Sometime in 1987, my criticism of the Yesavage study will be published in the American Journal of Psychiatry, where the original article appeared. The text of these criticisms is appended as Exhibit C. I have also attached as Exhibit D the criticisms of the article written by Dr. David Greenblatt; which appeared in the New York Times.

Briefly, the study was uncontrolled. The subjects were studied

with no placebos nor attempts to conceal the active treatment. Their efforts at a control run were compared to their efforts after they and the investigators knew that they had consumed active drug. This violates elementary rules of study design and constitutes a fatal flaw in the study. As I have noted, the study also fails to deal with the characteristics and prior use of drug by the volunteers, the issues of repeated testing and training upon the simulator users, and the generation of a large number of measures which may have varied by chance.

I have communicated with Dr. Yesavage's co-author and mentor, Dr. Leo Hollister, concerning my criticisms of the study. Dr. Hollister, an internationally known scientist of cannabinoid use and pharmacology, agrees that the study is not probative. He feels that it cannot be used to justify the testing of unimpaired workers under any circumstances.

### *COMMENTS BY MR. BENSINGER*

19. Mr. Bensinger cites anecdotal undocumented information which purportedly reflects improvements in the work place after drug testing has been imposed. As a seller of tests, he appears to be engaging chiefly in promotional and marketing techniques. However, one claim can be examined. He cites a particular study carried out by the Firestone Tire and Rubber Company which claims to document that "employees using drugs" have increased accident rates and induced marked increases in company costs. Since 1984, I have heard Mr. Bensinger and others frequently refer to the Firestone study. When I asked about the study, I learned that it discussed information generated by interviews with chronic alcoholics who had some under the care of the EAP program. If these impressions were true (and they might be), they come from a group of users of alcohol who lost control and were at a stage of job loss because they were impaired. It is important to note that they were not detected by urine testing for alcohol and Pacific does not propose to test for alcohol. To characterize all who use drugs or might use drugs by the yardstick of the chronic alcoholic is a strategic attempt to move from assessment of impairment to a sweeping program to identify deviance, not dysfunction.

Despite the apparent nature of the Firestone study I have continued in my efforts to locate the data of the study. After a number of inquiries, I received a mailing from the medical director of the company which I have attached. It is not a "study" at all and I can-

gy useful in some clinical and research settings is dreadfully incompetent in forensic settings. Indeed the use of TLC, an insensitive screen, will result in a high percentage of false negatives for the few drug-containing urines excreted.

22. Attached hereto are copies of references referred to herein. I declare under penalty of perjury that the foregoing is true and correct and if called to do so could competently testify thereto. Executed this 9th day of January, 1987 in New York City, New York.

JOHN P. MORGAN, M.D.

Sworn to before me this
9th day of January, 1987.

NOTARY

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND
282 JOHN O. PASTORE FEDERAL BUILDING
PROVIDENCE, RHODE ISLAND 02903-1779

TEL: (401) 752-7110
FAX: (401) 752-7106

ROBERT W. LOVEGREEN
UNITED STATES
MAGISTRATE JUDGE

June 3, 2002

Chris Rocheleau
P. O. Box 8200
High Security Facility
Cranston, RI 02920

Dear Mr. Rocheleau:

In response to your recent letter, I enclose a copy of this court's decision in Doctor v. Wall, 143 F. Supp. 2d 203 (D.R.I. 2001). Unless a matter involving the Morris Rules properly alleges a federal constitutional violation as required by the Doctor decision, the matter is properly brought in state court, not federal court. This court did not state that the Morris Rules were ineffective or that the ACI personnel were not bound by them.

I trust this answers your inquiry.

Sincerly,