Exhibit (B)

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND
282 JOHN O. PASTORE FEDERAL BUILDING
PROVIDENCE, RHODE ISLAND 02903-1779

TEL: (401) 752-7110
FAX: (401) 752-7106

ROBERT W. LOVEGREEN
UNITED STATES
MAGISTRATE JUDGE

July 15, 2002

Chris Rocheleau
P.O. Box 8200
High Security Facility
Cranston, RI 02920

Dear Mr. Rocheleau:

Your letter of July 1, 2002 has been received concerning whether Category B inmates can have radios. They cannot according to the Morris Rules as set forth in Morris v. Travisano, 499 F. Supp. 149, 161-74 (D.R.I. 1980). You also cited to Morris v. Tavisano, 310 F. Supp. 857 (D.R.I. 1970).

The 1970 version of the Morris Rules was replaced and finalized by the 1980 version. Whatever the 1980 version states is what is currently in effect.

While you cited to the Morris Rules as they affect Category B inmates, your letter references Category C inmates. In the most recent version of the Morris Rules, the 1980 version, Category C inmates are allowed radios with earphones only. See page 166 of the 1980 version. Category D inmates can have no television and no radio.

Insofar as the federal court is concerned, the 1980 version of the Morris Rules is the only set of rules currently in effect. The 1970 version has been replaced by the 1980 version.

I trust this answers your inquiry.

Sincerely,

Robert W. Lovegreen

*Affidavit of James Woodford, M.D.*

STATE OF GEORGIA

COUNTY OF DEKALB

*AFFIDAVIT*

Before me the undersigned officer duly authorized to administer oaths, appeared DR. JAMES WOODFORD, who after first being duly sworn under oath deposes and states as follows:

1. My name is JAMES WOODFORD and I have been asked by Counsel to describe the sources of error in computerized urinalysis tests for trace amounts of drugs.

2. I obtained my doctorate in Chemistry from Emory University in Atlanta (see Curriculum Vitae, Attachment A)* and received postdoctoral training in Medicinal Chemistry at the University of Kansas School of Pharmacy. I hold a Schedule One license with the Federal Drug Enforcement Administration and am registered with the Georgia State Board of Pharmacy. I have conducted independent examinations of evidence at the Georgia Bureau of Investigation Crime Lab and various other crime labs on a regular basis since 1975. I have authored articles about laboratory testing for court purposes. I have conducted laboratory studies in which specimens from dark skinned individuals showed false THC metabolite printouts on gas chromatography/mass spectrometry (GC/MS) confirmatory tests for marijuana. These proven studies are known in substance abuse literature as the Wiesbaden Melanin Studies. My current Patent Application relates to a specimen preparation procedure in which the pigment melanin is extracted from urine samples before analysis to ensure the elimination of racial prejudice in urinalysis test results.

3. All urine tests can make mistakes whether they are conducted by non-computer or by computer assisted test devices. A classic example is reported in *Clinical Chemistry* (Vol. 22, page 393, 1976). The report is about a professional woman who failed a manual thin-layer chromatography urine test for illegal drug use. The analysis report was placed in her employment files. After a formal protest she asked for independent testing which eventually found that a qui-

* Editor's note: Because of space limitations, this attachment has been deleted.

© Clark Boardman Callaghan 5/96 (DTM) 

nine metabolite from tonic water in her daily diet was mistakenly identified as cocaine. The newer computer assisted test devices are not 100% accurate. The June 1986 issue of *Chemical and Engineering News* reported studies concluding that if a person consumes a certain type of poppy seed cakes, enough morphine can be ingested to show up in screening and confirmatory tests.

4. In addition to dietary substances, which can test like controlled substances, there are *endogenous* substances, secreted by normal body chemistry, which can give false positive results and conclusions. Melanin is an endogenous substance excreted in urine that gives THC-like signals which invalidate the GC/MS ratio test for marijuana. Besides melanin there are other endogenous substances that can invalidate drug test results. To mention a few examples:

a. Morphine occurs naturally in cow and human milk at concentrations of 200 to 500 nanogram per liter. *Science,* Vol. 213, 1981.

b. Phenylethylamines (naturally produced) are endogenous amines that are structurally and pharmacologically related to amphetamines, *Science,* Vol. 206, page 470, 1979.

c. Alcohol, produced in the human intestine to the equivalent of one quart of beer each day, can throw off trace tests for alcohol. Reported at International Symposium on Alcohol Metabolism, Stockholm, 1973.

d. The human brain produces its own natural form of Schedule One controlled substances such as Dimethyltryptamine (DMT, *Science News,* Vol. 111, page 88, 1977) and phencyclidine (PCP, Angel dust, *Science News,* Vol. 116, page 276, 1979).

e. The brain manufacturers its own pure form of Valium, Ninth Annual Conference of the Society for Neuroscience, Atlanta, 1979. (At the same conference researchers reported that it is logical to conclude that drugs work because they mimic substances already being produced in the body.)

f. National Institute on Drug Abuse (NIDA) Research Monograph #32, "GC/MS Assays For Abused Drugs in Body Fluids" (page 22), mentions instances where unidentified endogenous compounds can show identical GC/MS output signals as either a drug or the internal standard. The monograph notes that, "When this situation occurs it can easily go undetected and result in erroneous data." One safeguard is to give the test output spectra and line graphs a sifting and thorough examination before accepting the results.

5. In addition to dietary and endogenous interferants, people are

exposed to environmental substances which can look like designer drugs in their urine tests. Two examples are: Paraquat, a weed killer chemically very similar to MPTP, a substance identified in synthetic designer heroin. In addition, the 3,4 methylenedioxy insecticides (such as Piperine) can metabolize into suspicious urinary fragments. GC/MS computer outputs from such insecticides can give points of comparison to suggest the presence of the controlled substance 3, 4-methylenedioxy methamphetamine (XTC or Ecstasy).

6. Independent examinations of test inputs, the computer programs and all outputs can indicate if urine test results are insufficient and erroneous. The electronically readable form of the software, the human readable form of the same material, the algorithm that describes what the software does and the source codes disclose if the computer programs which generate the GC/MS outputs are appropriate for such tests. Test output documents further indicate if the computer programs can be relied upon for the analysis of controlled substances. In particular, some computers do not discriminate well against random noise. Some programs do not filter extraneous responses and are incapable of distinguishing controlled substances from dietary, endogenous, and environmental substances. Added to this are reports in *Chemical and Engineering News* (June 1986) of over-the-counter painkillers such as Advil which can react the same as marijuana in preliminary drug screens. The GC/MS second test has been recommended to catch the preliminary errors. However, the second tests themselves have wide variations in accuracy.

7. The lack of correlation of enough points in a computer-assisted urine test spectrum (fingerprint) can negate a positive result. A spectrum is a computer output upon which the lab technician bases an opinion. Outputs can be obtained using either the costly high resolution, full-spectrum GC/MS monitors or the inexpensive under-resolved, selected ion monitors. The expensive devices give the full-spectrum or 100% fingerprint outputs. There are 23 major fingerprint characteristics for a urinary THC metabolite output. The leading manufacturer of moderately priced devices has indicated that 19 out of 23 (83%) points of comparison would constitute a positive result for trace amounts of drugs. One technician, regarded 9 points (40%) sufficient to call specimens positive for marijuana. A government spokesman on urinalysis testing reportedly recommended using 4 points (17%) of the GC/MS output. The most frequently used confirmation tests rely on 3 points (13%) as evidence. Some private labs use inexpensive devices that detect merely one point (4%) to confirm tests as positive. However, a high percentage of

points compared does not mean that GC/MS test results are accurate. For example, Research Monograph on Drug Urinalysis Testing (NIDA monograph, #73, page 35, 1986), pointed out that, "In spite of the remarkable potential capabilities of GC/MS, it should not be assumed that the results of all drug confirmations performed using GC/MS are conclusive."

8. Quality of the urine test can be determined by examining computer printouts produced by the test devices. Test documents can show to what extent the lab computer went in completing the output ratio match routines. A 100% ratio match is needed for valid testing. However, I have reviewed computer-assisted drug urinalysis tests that allowed 15%, 20% and greater variances in their GC/MS ratio match sub-routines yet still reported their drug urinalyses as positive.

9. To illustrate what bad test documents look like, I included Attachment B,* a typical Crime Lab report, in my Wiesbaden Studies on how melanin affects marijuana testing. Dr. Arthur McBay, who is Chief Medical Examiner of North Carolina, reviewed Attachment B and in published comments said that by glancing at the Crime Lab's GC/MS output, ". . . you can stand back eight feet and see that there is tremendous interference, these are not clean spectra, they don't mean anything. I do not see how you're going to get a ratio out of them or anything else. In other words, it's a misuse of GC/MS." I informed him that a man was in jail based on the findings in Attachment B.

10. Since the presence of melanin and various other substances can invalidate ratios in the confirmation tests, it is essential that the underlying data used in the testing, computer programs and programming be examined to determine if critical ratios are off. When labs use computers to calculate ratio matches, it is necessary for the person testing or reviewing the resulting findings, to see the algorithm control documents that guide the computer. When computers are used in drug urinalysis testing to calculate variations in ratios, and are used to form the basis upon which the lab results are reported, it is necessary to examine the computer algorithms—both the machine readable and the human readable forms.

11. To determine the reliability of drug urinalysis tests, it is essential to have an independent expert examine the underlying data used in the analyses, programs and programming methods, and to examine all computer inputs and outputs.

* Editor's note: Because of space limitations, this attachment has been deleted.

with low levels of marijuana, cocaine and prescription drugs, not enough for the victims to feel any drug effect but more than enough material was unwittingly ingested to show positive on urinalysis tests.

15. Urinalysis testing cannot show impairment or intoxication. It cannot tell when a drug was used. No legal scales for drug intoxication have been developed as has been done for blood alcohol in DWI cases. Urinalysis tests for alcohol were found to be so untrustworthy that breath tests are used instead of urine. There are other body fluids, like blood serum, blood plasma and saliva which are more helpful than urine for determining how long ago someone used a drug. Urine specimens are used for convenience and not with accuracy and precision foremost in mind.

This the 31 day of March, 1987.

__________________________

JAMES WOODFORD, Ph.D.

Sworn to and subscribed before
me this 31 day of March,
1987.

__________________________

NOTARY

## § 5:41 Polygraph testing

While a complete review of polygraph testing is not appropriate for this manual, a brief review is necessary, particularly relating to interpretations of these laws beyond polygraph tests. In 1988, the Federal Employee Polygraph Protection Act was enacted.[1] This Act applies to polygraph tests, not to other forms of honesty testing, e.g., paper and pencil honesty tests. Many states have passed laws prohibiting lie detector tests. Most of these are similarly limited to polygraphs and do not apply to other forms of honesty testing, although Massachusetts includes in its definition of "lie detector tests" written

[Section 5:41]
1 29 USC §§ 20001 et seq.